UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————————x

STUART FORCE, individually and as the
personal representative of the Estate of
TAYLOR FORCE, and HANANEL GEZ,

              Plaintiffs,                        25-cv-8582 (CM)

    -against-

THE PALESTINIAN AUTHORITY and
THE PALESTINE LIBERATION
ORGANIZATION,

Defendants.

———————————————————————————x


**OPINION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS**

McMahon, J.:

Under a policy referred to as "Pay-for-Slay," the Palestinian Authority ("PA") and Palestine Liberation Organization ("PLO") allegedly promise to pay Palestinians who carry out attacks against Israelis and foreign nationals in Israel, including Americans. Plaintiffs allege that the program is designed to encourage would-be attackers by providing assurances that they or their families will receive benefits if they are imprisoned, injured, or killed while carrying out an attack. They allege that this promise helped induce two Hamas attacks: (1) a 2016 stabbing that killed Taylor Force, and (2) a 2025 shooting that wounded Hananel Gez and killed his wife, Tzeela, as they were driving to the hospital for the delivery of their fourth child. The shooting fatally wounded their unborn son, Ravid Haim, who was delivered by emergency Caesarean section and died fifteen days later.

Plaintiffs assert a single claim under the Antiterrorism Act ("ATA"), as amended by the Justice Against Sponsors of Terrorism Act ("JASTA").[1]  JASTA permits secondary liability against anyone who "aids and abets, by knowingly providing substantial assistance," an act of international terrorism committed, planned, or authorized by a designated foreign terrorist organization.   18 U.S.C. § 2333(d)(2).   Congress directed courts to apply the common-law framework set out in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983).  JASTA, Pub. L. No. 114-222, § 2(a)(5), 130 Stat. 852, 852 (2016).  The ultimate question is whether a defendant "consciously and culpably participated in a tortious act in such a way as to help make it succeed." *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 497 (2023).

Defendants argue that payments made after an attack cannot assist an attack that is already over, and that a program that rewards qualifying attacks regardless of the perpetrator's factional affiliation bears too attenuated a connection to these particular attacks.  At this very early stage, neither argument warrants dismissal of the complaint.  Plaintiffs allege that Defendants made and publicized a standing promise of payment before the attacks, that the promise reached both attackers and influenced their decisions to act, and that Defendants later honored it.

Taken as true, these allegations plausibly state a claim that Defendants knowingly provided substantial assistance to the attacks.  Whether the program operated as alleged, whether either attacker knew of or relied on the promised benefits, and whether Defendants made the alleged

---

[1] The Promoting Security and Justice for Victims of Terrorism Act ("PSJVTA"), 18 U.S.C. § 2334(e), supplies the basis for personal jurisdiction over the PA and PLO, which Defendants do not contest.  The Supreme Court upheld the statute, concluding that "whatever the Fifth Amendment's outer limits on the territorial jurisdiction of federal courts, the PSJVTA does not transgress them." *Fuld v. Palestine Liberation Organization*, 606 U.S. 1, 19 (2025). "The PSJVTA reasonably ties the assertion of federal jurisdiction over the PLO and PA to conduct that involves the United States and implicates sensitive foreign policy matters within the prerogative of the political branches." *Id.* at 25.

payments are factual questions that require a developed record.   The motion to dismiss is **DENIED**.

## I.   BACKGROUND

### A.  The Parties and the Alleged Payment Program

Plaintiff Stuart Force is a United States citizen who sues individually and as the personal representative of the estate of his son, Taylor Force.  Dkt. No. 30, ¶ 19.  Plaintiff Hananel Gez is a dual citizen of the United States and Israel who sues on his own behalf.  *Id.*, ¶ 20.

The PLO is a political umbrella organization founded in 1964 by the Arab League.  *See Sokolow v. Palestine Liberation Organization*, 60 F. Supp. 3d 509, 513 (S.D.N.Y. 2014).  As part of the 1993 Oslo Accords, Israel recognized the PLO as the representative of the Palestinian people.  *Id.*  Following the Accords, the PLO established the PA to serve as the governing authority in the West Bank and Gaza Strip.  *Id.*  Neither Defendant is an individual, corporation, or partnership.  *Id.*  Fatah controls the PA and is the dominant faction within the PLO.  Dkt. No. 30, ¶ 22.  Mahmoud Abbas serves as President of the PA and Chairman of both the PLO and Fatah. *Id.*

The complaint alleges that Defendants operate two related payment systems.  Dkt. No. 30, ¶¶ 2, 72–98.

The first provides salaries and related benefits to Palestinians imprisoned by Israel for conduct associated with what Palestinian law calls "the struggle against the occupation."  *Id.*, ¶ 74. In 1998, PLO leader Yasser Arafat established the PA's Ministry of Prisoners Affairs to administer payments to those prisoners.  *Id.*, ¶ 72.  Under President Abbas, Defendants expanded the system and codified its benefits through a series of laws, decrees, and government decisions.  *Id.*, ¶¶ 73– 76.

According to the complaint's translation, Article 1 of the Amended Palestinian Prisoners Law No. 19 (2004) defines a "prisoner" as "anyone incarcerated in the occupation's prisons for his participation in the struggle against the occupation." *Id.*, ¶ 74 (quoting Amended Palestinian Prisoners Law No. 19 (2004), art. 1). Article 2 describes prisoners and released prisoners as "a fighting sector and an integral part of the fabric of the Arab Palestinian society." *Id.*, ¶ 75 (quoting Amended Palestinian Prisoners Law No. 19 (2004), art. 2). Article 6 directs the PA to grant every incarcerated prisoner a monthly salary "without discrimination," as well as a clothing allowance twice each year. *Id.* (quoting Amended Palestinian Prisoners Law No. 19 (2004), art. 6).

The PA's Government Decision No. 23 (2010) ties the amount of the monthly salary to the number of years the prisoner has served. *Id.*, ¶ 76. Payments begin at 1,400 shekels per month for the first three years of imprisonment and rise to 12,000 shekels per month after thirty years. *Id.*, ¶ 83. The complaint alleges that the initial payment roughly equals the average monthly salary in the West Bank. *Id.*, ¶ 84. Because more serious offenses generally carry longer sentences, Plaintiffs allege that the PA's payment schedule awards larger payments for more serious acts of violence. *Id.*, ¶¶ 76, 83.

The program also provides benefits to prisoners' families and to prisoners after their release. A prisoner receives additional monthly payments for a spouse and each child. *Id.*, ¶ 86. For a released prisoner employed by the PA or PLO, Article 8 counts the years spent in prison toward civil-service seniority and requires the PA to make corresponding social-security and pension contributions. *Id.*, ¶ 87. Decree Law No. 1 of 2013 provides additional post-release benefits, including priority for employment with the PA and PLO, guaranteed employment or a continuing salary for certain prisoners, a grant upon release for prisoners who served at least one year, and tuition and health-insurance benefits. *Id.* ¶¶ 88–89.

The second payment system provides benefits to Palestinian "martyrs" injured during attacks and to the families of Palestinians killed while carrying them out. *Id.*, ¶¶ 92–98. These benefits are administered by the Institution for Families of the Martyrs and the Injured (the "Institution"). *Id.*, ¶ 95. The Institution became an official organ of the PLO in 1971, was later housed within a PA ministry, and was transferred back to the PLO in 2005. It is overseen by the PA and funded by the PA's Ministry of Finance. *Id.*, ¶¶ 95–96.

The complaint alleges that the Institution carefully investigates the circumstances of an injury or death of any putative "martyr" to ensure that benefits are disbursed only for acts that result in terrorism-related deaths. *Id.*, ¶ 97. Palestinians who die from natural causes, accidents, or ordinary criminal activity are ineligible. *Id.*, ¶¶ 90, 97. The family of an attacker who is killed receives an initial payment of 6,000 shekels followed by a monthly stipend of 1,400 shekels. *Id.*, ¶ 98. An injured attacker receives between 700 and 1,400 shekels per month, depending on the extent of his injury. *Id.*, ¶¶ 93, 98.

Both Defendants allegedly participate in administering these payments. In 2014, the PA transferred responsibility for prisoner payments from the PA's Ministry of Prisoners Affairs to a newly created PLO commission, while continuing to provide the funds. Dkt. No. 30, ¶ 77. Responsibility for prisoner payments returned to a PA ministry in 2018 and shifted back to the PLO in 2020. *Id.*, ¶ 78. When Palestinian banks stopped processing payments in 2021, the PA allegedly arranged for them to be distributed through PA-controlled post offices. These post offices served as "authorized payment centers" for the program. *Id.*, ¶¶ 99–106. President Abbas, who heads both Defendants, allegedly retained ultimate authority over the program throughout these administrative changes. *Id.*, ¶¶ 22, 77–82, 114.

Hamas has been designated a foreign terrorist organization ("FTO") since 1997. Then–Secretary of State Madeleine K. Albright designated Hamas as an FTO on October 8, 1997, well before either attack at issue here. *Designation of Foreign Terrorist Organizations*, 62 Fed. Reg. 52,650, 52,650 (Oct. 8, 1997).

The complaint acknowledges that Fatah and Hamas are political rivals and have at times engaged in violent conflict. *Id.*, ¶¶ 58–59. It alleges, however, that organizational affiliation does not determine eligibility for payment. *Id.*, ¶¶ 67, 107–10. The complaint interprets Article 6's direction that salaries be paid "without discrimination" to require payment without regard to the prisoner's party or organizational affiliation. *Id.*, ¶ 108. Members and affiliates of Hamas are therefore allegedly eligible for the same benefits as members of Fatah and other Palestinian organizations. *Id.*, ¶¶ 67, 107–10.

The complaint also identifies public statements by senior Palestinian officials that praised the conduct rewarded under the program and emphasized that such recognition extended across factional lines. In October 2015, Jibril Rajoub, then the deputy secretary of Fatah's Central Committee, described recent attacks on PA television as "individual acts of bravery" and stated, "I am proud of them. I congratulate everyone who carried them out." *Id.*, ¶ 143. Rajoub then described "the fighter, the prisoner, or the Martyr" as "assets to the entire Palestinian people" and said that Fatah did not concern itself with "who is Fatah and who is not." *Id.*

Plaintiffs allege that former PA Prime Minister Salam Fayyad publicly acknowledged the payment program in 2019. Dkt. No. 30, ¶ 15. Although the PA announced changes to the program in February 2025, Plaintiffs allege that President Abbas promptly assured the Palestinian public that the payments would continue, stating, "I told you once, and I stand by my word: Even if we

have [only] one penny left, it is for the prisoners and martyrs. . . . They must receive everything, *as it was in the past*, and they are more precious than all of us!" *Id.*, ¶¶ 111–13.

President Abbas then directed the Palestinian National Economic Empowerment Institution ("PNEEI") to oversee payments to prisoners and the families of "martyrs." *Id.*, ¶ 114. Abbas appoints PNEEI's board of trustees, ten of whose eleven members allegedly hold senior positions within the PA. *Id.* In May 2025, the Director of the Commission of Prisoners' Affairs confirmed that the Commission had sent a list of eligible prisoners to the PA's Ministry of Finance for the disbursement of salaries, "as regularly happens every month." *Id.*, ¶ 115. The complaint alleges that the program remained active when the Gez family was attacked and that payments continued to be distributed later in 2025. *Id.*, ¶¶ 115–21.

### B. The Attack on Taylor Force

Taylor Force was a twenty-eight-year-old United States citizen from Lubbock, Texas. He graduated from the United States Military Academy in 2009 and served as an Army field-artillery officer, including during deployments to Iraq and Afghanistan. Dkt. No. 30, ¶¶ 19, 147. In March 2016, he was a first-year M.B.A. student at Vanderbilt University and traveled to Israel with classmates to study global entrepreneurship. *Id.*, ¶¶ 147–48.

On March 8, 2016, Force was walking along the promenade in Jaffa, Israel when Bashar Massalha attacked pedestrians with a knife. Massalha killed Force and wounded ten others before Israeli security forces shot and killed him. *Id.*, ¶¶ 148–51. The complaint alleges that Hamas carried out the attack. *Id.*, ¶¶ 152, 184.

The attack occurred during a wave of stabbings and other violent acts that began in the fall of 2015. In the months preceding Force's death, PA, PLO, and Fatah officials allegedly praised recent attacks as "acts of bravery," endorsed a "mass insurgency," and called for the "continuation

of the intifada." *Id.*, ¶¶ 143, 146. Plaintiffs further allege that Massalha knew that he or his family would receive benefits if he were imprisoned or killed and that this assurance motivated his decision to attack. *Id.*, ¶ 150.

After the attack, official PA and Fatah media repeatedly referred to Massalha as a "martyr." Fatah's official Facebook account called him "the heroic martyr," and official PA television also described him as a martyr. Dkt. No. 30, ¶ 153. A PA television report described his funeral as "a large national wedding befitting of Martyrs." *Id.*, ¶ 155. An official PA newspaper, *Al-Hayat Al-Jadida*, reported that he had died "after carrying out a stabbing operation in Jaffa, in which he killed an American tourist." *Id.*, ¶ 156. The complaint alleges, on information and belief, that Massalha's family received an initial payment of 6,000 shekels, has since received at least 159,600 shekels in monthly payments, and continues to receive 1,400 shekels each month. *Id.*, ¶ 157.

### C. The Attack on the Gez Family

On May 14, 2025, Hananel and Tzeela Gez were driving to a hospital for the delivery of their fourth child when Palestinian gunmen ambushed their car. Dkt. No. 30, ¶ 172. Hananel suffered shrapnel wounds to his chest and an injury to his hand. *Id.*, ¶ 173. Tzeela was shot in the chest and neck. *Id.* Doctors delivered the couple's son, Ravid Haim, by emergency Caesarean section. *Id.*, ¶ 174. The mother died from her injuries. Ravid Haim survived for fifteen days before dying on May 29, 2025. *Id.*

The complaint identifies Nael Samarah as one of the attackers. *Id.*, ¶ 172. It alleges that Samarah was a member or affiliate of Hamas and had previously been imprisoned for "terror activity." *Id.*, ¶ 178. Plaintiffs further allege that Samarah knew that he or his family would receive benefits under the payment program if he were imprisoned or killed and that the promised

payment helped induce him to participate in the attack. *Id.*, ¶¶ 176, 183.  The Israel Defense Forces

("IDF") killed Samarah during a counterterrorism operation three days later. *Id.*, ¶ 175.

The PA's official newspaper *Al-Hayat Al-Jadida* later reported that Samarah "died as a

Martyr" and identified the date and circumstances of his death. *Id.*, ¶ 179.  The complaint alleges

that payments to Samarah's family were processed on August 6, 2025. *Id.* ¶ 180.  Plaintiffs allege,

on information and belief, that Samarah's family received an initial payment of approximately

6,000 shekels by that date and has received stipends of 1,400 shekels every month thereafter. *Id.*,

¶ 181.

## II.    LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint

must contain enough factual matter, accepted as true, to "state a claim to relief that is plausible on

its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*,

550 U.S. 544, 570 (2007)).  A claim is plausible when the alleged facts allow the Court to draw a

reasonable inference that the defendant is liable for the conduct alleged. *Id.*  Plausibility does not

require a showing that liability is probable, but it requires more than "a sheer possibility that a

defendant has acted unlawfully." *Id.*

The Court accepts all well-pleaded factual allegations as true and draws all reasonable

inferences in Plaintiffs' favor. *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d

Cir. 2021).  It does not, however, credit legal conclusions, "[t]hreadbare recitals of the elements of

a cause of action," or conclusory statements unsupported by factual allegations. *Iqbal*, 556 U.S.

at 678.  The Court considers the allegations collectively and in light of the governing substantive

law; it does not resolve competing plausible inferences against Plaintiffs at the pleading stage. *See*

*Kaplan*, 999 F.3d at 854; *Anderson News, L.L.C. v. American Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012).

In deciding the motion, the Court may consider the complaint, documents incorporated into it by reference, documents upon whose terms and effect the complaint relies, and matters subject to judicial notice. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002). When the Court takes notice of prior pleadings or other public records, it may consider what those documents stated, but generally may not accept statements contained therein for the truth of the matters asserted. *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007).

## III.    DISCUSSION

### A.  Governing Framework

JASTA imposes secondary civil liability on anyone who "aids and abets, by knowingly providing substantial assistance," an act of international terrorism committed, planned, or authorized by a designated foreign terrorist organization. 18 U.S.C. § 2333(d)(2). Congress identified *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), as providing "the proper legal framework" for applying that provision. JASTA, Pub. L. No. 114-222, § 2(a)(5), 130 Stat. 852, 852 (2016).

Under *Halberstam*, a plaintiff must establish three elements: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation." 705 F.2d at 477. To determine whether the assistance was substantial under the third element, courts consider "the nature of the act assisted," the "amount of assistance" provided, the defendant's presence at the time of the tort, the defendant's relationship with the

principal wrongdoer, the defendant's state of mind, and the duration of the assistance. *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 486 (2023) (quoting *Halberstam*, 705 F.2d at 488).

These elements and factors are guides, not a mechanical checklist. The Supreme Court has instructed that they "should not be taken as inflexible codes," but should be applied to determine whether the defendant "consciously and culpably participated in a tortious act in such a way as to help make it succeed." *Twitter*, 598 U.S. at 497 (citation modified). The aim is to identify assistance that is "both significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor." *Id.* at 504.

The first element concerns the conduct of the principal wrongdoer. For purposes of this motion, Defendants concede that Hamas committed, planned, or authorized the two attacks, that the attacks were acts of international terrorism, and that the attacks caused Plaintiffs' injuries. The first element and the related statutory prerequisites are therefore satisfied.

The second element, general awareness, concerns what Defendants understood about their own role when they provided the alleged assistance. A defendant must be "generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance." *Twitter*, 598 U.S. at 486 (quoting *Halberstam*, 705 F.2d at 477). General awareness requires "something less than full, or fully focused, recognition." *Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420, 438 (2d Cir. 2025) (quoting *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 863 (2d Cir. 2021)). "In other words, although a defendant need not be aware of its role in the specific terrorist attack that caused the plaintiff's injury, it must be generally aware of its role in some illegal activity from which the terrorist attack was foreseeable." *Id.*

The third element asks whether Defendants knowingly and substantially assisted the attacks. A defendant must have assisted "the act of international terrorism that injured the

plaintiffs," although that requirement "does not always demand a strict nexus between the alleged assistances and the terrorist act." *Id.* at 438–39 (quoting *Twitter*, 598 U.S. at 497).  Thus, "a close nexus between the assistance and the tort might help establish that the defendant aided and abetted the tort, *but even more remote support can still constitute aiding and abetting in the right case.*" *Twitter*, 598 U.S. at 496 (emphasis added).  As the connection becomes more attenuated, however, courts must demand a stronger showing "that plaintiffs show culpable participation through intentional aid that substantially furthered the tort." *Id.* at 506.  The "knowing" and "substantial" requirements therefore "work in tandem": "a lesser showing of one" requires "a greater showing of the other." *Ashley*, 144 F.4th at 438 (quoting *Twitter*, 598 U.S. at 491–92).

At issue is whether Plaintiffs plausibly allege both that Defendants were generally aware of their role in the alleged terrorist activity and that they knowingly and substantially assisted the two attacks.  Before addressing these questions, the Court addresses Defendants' reliance on materials outside the complaint and their related judicial-estoppel argument.

### B.  Extrinsic Evidence and Judicial Estoppel

Defendants first argue that Plaintiffs cannot plausibly allege that Defendants aided attacks carried out by Hamas because the PA and Hamas are longstanding political rivals.  They rely on newspaper articles, congressional and State Department reports, other policy materials, and filings from Plaintiff Force's prior lawsuits.  Dkt. No. 36 at 5–8 & nn.4–10.

These materials afford no basis for the Court to dismiss the complaint on this motion.

On a motion under Rule 12(b)(6), the Court may consider public records that are subject to judicial notice.  But that authority is limited.  The Court may take notice of prior court filings to establish the existence of the litigation and the positions the parties took.  *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).  It may likewise take notice that press reports and

other public records contained particular statements. *See Staehr v. Hartford Financial Services Group, Inc.*, 547 F.3d 406, 425 (2d Cir. 2008). The Court can determine "what statements [the records] contained," but may not accept those statements "for the truth of the matters asserted." *Roth*, 489 F.3d at 509.

The reports cited by Defendants assert that the PA and Hamas have been described as political enemies. In connection with this motion, the Court may not accept them for the truth of that proposition. Even if it could, they do not resolve whether Defendants' alleged payment program reached and encouraged Massalha and Samarah. The complaint itself acknowledges that Fatah and Hamas are rivals and have engaged in violent conflict. Dkt. No. 30, ¶¶ 58–59. At issue is whether Defendants' payment program nevertheless encouraged the attacks alleged here. The Court cannot resolve that question by accepting Defendants' account of the relationship between the PA and Hamas over Plaintiffs' well-pleaded allegations. *See Chambers*, 282 F.3d at 154 (explaining that a court presented with disputed materials outside the pleadings must exclude them or convert the motion into one for summary judgment). "Consideration of extraneous material in judging the sufficiency of a complaint is at odds with the liberal pleading standard of Federal Rule of Civil Procedure 8(a)(2), which requires only that the complaint contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Id.*

Defendants separately contend that Plaintiff Force is judicially estopped from alleging that Defendants aided attacks carried out by Hamas affiliates through the payment program. They rely on positions Force took in two earlier lawsuits.

In *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 338 (D.D.C. 2020), Force presented expert evidence, which the court credited in entering default judgment, that Hamas "employs a three-pronged strategy" that includes "political activity that competes with the secular

Palestinian Authority" as well as "terrorist attacks that target Israeli soldiers and civilians." With respect to Massalha specifically, the court credited evidence that, following his funeral, "Palestinian Authority security forces[] also arrested a number of the funeral's participants as part of a series of arrests of open Hamas supporters." *Id.* at 344.

In *Force v. Facebook Inc.*, No. 16-CV-5158 (NGG) (E.D.N.Y.), Force alleged that Hamas had "forcibly seized control of Gaza from the Palestinian Authority" in 2007 and that, "In its effort to derail the 1993 Oslo Accords that established the [PA]," Hamas had carried out scores of terrorist attacks against Israel. Dkt. No. 28, ¶¶ 50, 54 (E.D.N.Y. Oct. 10, 2016). He also quoted a January 2016 Facebook post by a Hamas operative celebrating a "stabbing operation" and declaring: "Once again the sons of #HAMAS rebuff [PA President] Mahmoud Abbas and [PA Intelligence Chief] Majid Faraj in their own way." *Id.*, ¶ 476.

Defendants argue that these prior positions cannot be reconciled with Force's present allegation that the PA and PLO maintained a payment program that encouraged attacks committed by Hamas affiliates. Dkt. No. 36 at 6–8.

Judicial estoppel "forbids a party from advancing contradictory factual positions in separate proceedings." *AXA Marine & Aviation Insurance (UK) Ltd. v. Seajet Industries Inc.*, 84 F.3d 622, 628 (2d Cir. 1996). The party invoking the doctrine must show that the opposing party "advanced an inconsistent factual position in a prior proceeding" and that "the prior inconsistent position was adopted by the first court in some manner." *Id.* The later position must be "clearly inconsistent" with the earlier one, and the party must have "succeeded in persuading a court to accept" the earlier position. *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001).

The prior proceedings do not establish the inconsistency Defendants posit.

These prior positions are not clearly inconsistent with the allegations in the complaint presently before the Court. Again, Plaintiffs themselves acknowledge the historical rivalry between Hamas and Defendants. Dkt. No. 30, ¶¶ 58–59. The complaint does not allege that Defendants and Hamas were allies or that they jointly planned the attacks. It alleges that Defendants maintained a standing payment program whose eligibility did not depend on factional affiliation, that Hamas affiliates could receive its benefits, and that the program reached and encouraged Massalha and Samarah. *Id.*, ¶¶ 67, 107–10, 150, 176, 183. Political hostility toward Hamas can coexist with a program that allegedly rewards conduct undertaken by Hamas affiliates. Plaintiffs' claim therefore does not depend on accepting the allegation that Defendants and Hamas were friendly allies.

Nor did either prior court adopt a position inconsistent with the complaint here. *Force v. Iran* accepted evidence that Hamas competed with the PA and that PA forces arrested Hamas supporters at Massalha's funeral. It did not decide whether Defendants' payment program was available to Hamas affiliates or whether that program encouraged Massalha.

The *Facebook* litigation likewise did not adjudicate the truth of Force's allegations concerning the relationship between Hamas and the PA. There, Force and other victims of Hamas attacks alleged that Facebook violated the ATA by allowing Hamas to use its platform to communicate, disseminate propaganda, recruit supporters, and promote attacks. *Force v. Facebook, Inc.*, 934 F.3d 53, 57–61 (2d Cir. 2019). The Second Circuit held that those claims were barred by 47 U.S.C. § 230(c)(1), which provides that an online service may not be treated as "the publisher or speaker" of content supplied by another person. *Id.* at 64. The court concluded that Facebook's alleged decisions to host Hamas's content, decline to remove it, and recommend it to users were publishing functions covered by the statute. *Id.* at 65–67. Because the dismissal

rested on this particular statutory protection, the court accepted the complaint's allegations as true and made no factual finding concerning the relationship between Hamas and the PA.  *Id.* at 57–58.  The *Facebook* litigation never addressed whether Defendants' payment program extended to Hamas affiliates or encouraged the attacks alleged here.

Because Plaintiff Force's prior positions are not "clearly inconsistent" with his allegations here, and because neither court adopted the supposedly inconsistent proposition on which Defendants rely, judicial estoppel does not bar Force from maintaining this lawsuit.

### C.  General Awareness

Plaintiffs plausibly allege that Defendants were generally aware that, by maintaining and publicizing the payment program commonly known as "Pay-for-Slay," they were assuming a role in violent activity.

Many of the leading ATA cases addressing general awareness involve banks accused of assisting terrorist activity by providing financial services to customers or intermediary institutions with alleged ties to terrorist organizations.  In those cases, the financial service itself is ordinarily lawful and the bank does not directly participate in the underlying violence.  The question, therefore, becomes what the bank knew about the customers or intermediaries it was serving and whether that knowledge made it plausible that the bank understood it was assuming a role in terrorist activity.  *See, e.g.*, *Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420, 438 (2d Cir. 2025)*; Honickman v. BLOM Bank SAL*, 6 F.4th 487, 501–03 (2d Cir. 2021); *Siegel v. HSBC North America Holdings, Inc.*, 933 F.3d 217, 224–26 (2d Cir. 2019).

This case is different.  Plaintiffs do not allege that Defendants unknowingly provided a generally available service to an intermediary that later supported terrorism.  They allege that

Defendants themselves designed, codified, funded, administered, and defended the challenged payment program.  Dkt. No. 30, ¶¶ 72–82, 95–106, 111–25.

The alleged eligibility rules make the inference of general awareness straightforward. According to the complaint's translation, Article 1 of the 2004 Palestinian prisoners law defines a covered "prisoner" as "anyone incarcerated in the occupation's prisons for his participation in the struggle against the occupation."  *Id.*, ¶ 74.  Article 2 describes prisoners and released prisoners as "a *fighting sector* and an integral part of the fabric of the Arab Palestinian society," while Article 6 "grant[s] every incarcerated prisoner a monthly salary, without discrimination."  *Id.*, ¶ 75. Participation in the "struggle against the occupation" allegedly triggers the benefits, and the resulting term of imprisonment determines the monthly payment.  *Id.*, ¶¶ 76, 83.  Defendants' alleged enactment and administration of these rules support the inference that they well understood the conduct that qualified for payment and the basis on which the payment increased.

The criteria alleged for payments to injured persons and the families of persons killed are even more explicit.  The complaint alleges that the administering Institution ensures that its funds are used "*only for terrorism-related deaths*" and verifies that the person "was killed or injured committing an act of terror or killed or injured accidentally during a counter-terrorism operation." *Id.*, ¶ 97 (emphasis added).  It further alleges that the family of a person designated a "martyr" becomes eligible for an initial grant and monthly stipend following "the martyr's death in a terrorist attack against Israel."  *Id.*, ¶ 98.  Persons who die from natural causes, accidents unrelated to counterterrorism operations, or ordinary criminal activity do not qualify.  *Id.*, ¶ 97.  As alleged, an act of terror against Israel – or injury or death during the ensuing counterterrorism response – is the qualifying event.  Before authorizing payment, the Institution investigates the date, location, and circumstances of the injury or death.  *Id.*  Defendants therefore allegedly confer benefits only

after determining that the qualifying violence occurred.  This process supports a direct inference that they understood what conduct they were rewarding and the relationship between the benefits and that conduct.

Defendants' official statements alleged in the complaint reinforce the inference.  When administration of the prisoner-payment system shifted from the PA to a PLO commission in 2014, the commission's newly appointed head Issa Karake allegedly stated that the change would "in no way affect the importance and significance of the prisoners' issue," either "in terms of politics and the struggle" or "in terms of the services [provided] to the prisoners."  *Id.*, ¶ 78 n.40.  A PA spokesman allegedly explained that the restructuring would "provide political and legal cover for this issue" and "eliminate[]" objections from parties who maintained that foreign aid to the PA was funding the payments.  *Id.*  Taken as true, these statements support the inference that the administrative transfer was designed to preserve the payments while insulating the PA from donor objections that their donations were financing terrorist acts.  Accepting Plaintiffs' well-pleaded allegations as true, Defendants clearly understood that its program paid for violent acts and deliberately chose to continue funding it.

The complaint also alleges that President Abbas publicly praised bloodshed and martyrdom during the wave of attacks preceding Force's death.  He stated, "We bless every drop of blood that has been spilled for Jerusalem, which is clean and pure blood, blood spilled for Allah, Allah willing.  Every Martyr (Shahid) will reach Paradise, and everyone wounded will be rewarded by Allah."  *Id.*, ¶ 144.  This statement has limited independent significance to the operation of the payment program.  Read together with the alleged eligibility rules and official statements described above, however, it is consistent with Plaintiffs' allegation that Defendants publicly praised the participants in their "Pay-for-Slay" policy.

Congress itself has expressly found that the PA's payment practice creates an incentive for additional terrorist acts. "The Palestinian Authority's practice of paying salaries to terrorists serving in Israeli prisons, as well as to the families of deceased terrorists, is an incentive to commit acts of terror." Taylor Force Act, Pub. L. No. 115-141, div. S, tit. X, § 1002(1), 132 Stat. 348, 1143 (2018).

Congress later addressed payments of this kind in the ATA itself. Under the Promoting Security and Justice for Victims of Terrorism Act ("PSJVTA"), the PA and PLO "shall be deemed to have consented to personal jurisdiction" in an ATA action if they make a payment to the designee of a person imprisoned for committing an act of terrorism that injured or killed an American, "if such payment is made by reason of such imprisonment," or to the family of a person who dies while committing such an act, "if such payment is made by reason of the death of such individual." 18 U.S.C. § 2334(e)(1)(A)(i)–(ii). The Supreme Court described this jurisdictional predicate as relating to the PA's and PLO's practice "of paying salaries to terrorists serving in Israeli prisons, as well as to the families of deceased terrorists" – conduct that Congress had condemned as "an incentive to commit acts of terror." *Fuld v. Palestine Liberation Organization*, 606 U.S. 1, 8–9 (2025) (quoting Taylor Force Act § 1002(1), 132 Stat. 1143). The PSJVTA's payment-based jurisdictional provision obviously cannot establish Defendants' particular state of mind or their liability for either attack. It does, however, reinforce the plausibility of the incentive mechanism Plaintiffs allege, namely that Defendants' standing promise of benefits can encourage and induce qualifying acts of violence.

Defendants emphasize that the complaint does not allege that they knew, before the attacks, that either Massalha or Samarah was affiliated with Hamas. General awareness, however, does not require advance knowledge of the particular attacker or attack. *See Ashley*, 144 F.4th at 438.

- 19 -

It requires awareness that the defendant was playing a role in illegal activity from which the attack was "foreseeable." *Id.* Plaintiffs allege that eligibility did not depend on factional affiliation and expressly extended to Hamas members and affiliates. Dkt. No. 30, ¶¶ 67, 107–10. Because the program allegedly promised benefits for qualifying violence regardless of the perpetrator's affiliation, attacks by Hamas affiliates fell within the category of conduct that Defendants had chosen to reward.

Defendants' reliance on *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856 (D.C. Cir. 2022), is misplaced. In *Bernhardt*, the plaintiffs alleged that HSBC deliberately circumvented sanctions administered by the Treasury Department's Office of Foreign Assets Control ("OFAC"). U.S. financial institutions used an "OFAC filter" to identify and block transactions involving sanctioned countries, persons, and entities. HSBC allegedly defeated that screening process by stripping references to Iran and other sanctioned entities from payment instructions and using "cover payments" that concealed customers' identities, thereby allowing thousands of transactions worth billions of dollars to pass through the U.S. financial system. *Id.* at 862–63. The scheme allegedly benefited several foreign banks with ties to terrorist organizations, including two Iranian banks that had provided financial services to entities supporting terrorist groups and a Saudi bank with alleged connections to al-Qaeda. *Id.* at 863.

But the court found the connection to al-Qaeda too attenuated. As to the Iranian banks, their connections to Iran and terrorism generally did not show that HSBC's assistance benefited al-Qaeda rather than legitimate Iranian operations. And although the Saudi bank had more substantial alleged ties to al-Qaeda, it was a major financial institution with extensive legitimate operations, and the complaint did not allege that HSBC's assistance flowed through it to al-Qaeda.

*Id.* at 865, 868–70.  The court therefore could not plausibly infer that HSBC was generally aware that it was assuming a role in al-Qaeda's terrorist activities.  *Id.* at 870.

The allegations here do not depend on a comparable chain of inference upon inference. The prisoner program covers persons incarcerated for participating in the "struggle against the occupation"; the separate program for injured persons and families of persons killed allegedly conditions benefits on injury or death connected to terrorist activity.  Dkt. No. 30, ¶¶ 74–76, 92–98.  There is no intermediary whose legitimate activities might explain where Defendants' assistance went.  The violent conduct itself determines eligibility for benefits.  The pleaded connection between Defendants' conduct and terrorist activity therefore appears from the very terms of the programs they administered.

On the pleaded facts, Defendants themselves established the eligibility criteria for their "Pay-for-Slay" policy, investigated whether those criteria were met, and authorized payments to eligible attackers or their families.  These allegations plausibly support the inference that Defendants understood the program's connection to violent conduct.  Plaintiffs have adequately pleaded general awareness.

### D.  Knowing and Substantial Assistance

Plaintiffs plausibly allege that Defendants knowingly and substantially assisted the attacks. JASTA requires assistance to the "act of international terrorism that injured the plaintiffs," rather than merely to the responsible organization's "activities in general."  *Ashley*, 144 F.4th at 438, 444–45 (quoting *Twitter*, 598 U.S. at 503).  The complaint alleges a direct, attack-specific nexus. Defendants allegedly made and publicized a standing promise of benefits for qualifying violence; Massalha and Samarah allegedly knew of that promise; and the promise influenced each man's decision to carry out his respective attack.

- 21 -

The complaint alleges that Defendants publicly promised financial benefits to persons imprisoned or injured for qualifying attacks and to the families of persons killed while carrying out such attacks or during the ensuing response. Dkt. No. 30, ¶¶ 74–98. Massalha allegedly knew that he or his family would receive those benefits if he were captured or killed, and that assurance contributed to his decision to carry out the stabbing. *Id.*, ¶ 150. Plaintiffs allege the same of Samarah, who had previously been imprisoned for terrorist activity. *Id.*, ¶¶ 176, 178, 183. These allegations must ultimately be proved with admissible evidence. At the pleading stage, however, the Court asks only whether they are plausible. The program's alleged public and longstanding operation, together with the specific allegations concerning each attacker's knowledge and motivation, permits the inference that each knew of and was influenced by the promised benefits.

The timing of the alleged assistance is critical. "A person cannot be found guilty of aiding and abetting a crime that already has been committed." *United States v. Shulman*, 624 F.2d 384, 387 (2d Cir. 1980); *see also United States v. Reifler*, 446 F.3d 65, 96 (2d Cir. 2006) (holding that an individual cannot aid and abet "a crime that was completed before his accessorial acts were performed"). A payment first promised only after an attack therefore comes too late to have assisted the attack.

But a promise made before the attack presents a different question altogether. Plaintiffs allege that Defendants made a standing promise of benefits in advance and that the promise itself encouraged Massalha and Samarah to act. The common-law framework Congress incorporated into JASTA makes clear that encouragement can itself constitute aid.

Section 2333(d)(2) imposes liability on a person who "aids and abets, by knowingly providing substantial assistance." Although JASTA does not define "aids and abets," the phrase is a familiar common-law term and therefore presumptively "brings the old soil" with it. *Twitter*,

598 U.S. at 484 (quoting *Sekhar v. United States*, 570 U.S. 729, 733 (2013)).  Congress made the relevant common-law tradition explicit by identifying *Halberstam* as "provid[ing] the proper legal framework" for civil aiding-and-abetting liability under the ATA.  *Id.* at 484–85 (quoting JASTA § 2(a)(5), 130 Stat. 852).  *Halberstam*, in turn, looked to § 876(b) of the Restatement in articulating that framework.  *See Halberstam*, 705 F.2d at 477–78.

The Restatement expressly treats encouragement as a form of assistance.  Section 876(b) imposes liability where a defendant "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or *encouragement to the other so to conduct himself.*"  Restatement (Second) of Torts § 876(b) (Am. L. Inst. 1979) (emphasis added).  The accompanying commentary is even more explicit:  "Advice or encouragement to act operates as a moral support to a tortfeasor and if the act encouraged is known to be tortious it has the same effect upon the liability of the adviser as participation or physical assistance."  *Id.*, cmt. d.  If the encouragement is "a substantial factor in causing the resulting tort," the person providing it "is himself a tortfeasor."  *Id.*  The Restatement illustrates the point with a riot in which one participant, although "throwing no rocks himself," encourages another to throw the rock that strikes a bystander; the encourager is liable for the resulting injury.  *Id.*, illus. 4.

This understanding of encouragement is deeply rooted in the law of aiding and abetting. The Supreme Court recently explained that facilitation – "also called aiding and abetting" – does not require physical assistance; "words may be enough."  *United States v. Hansen*, 599 U.S. 762, 771 (2023).  *Hansen* relied on *Reves v. Ernst & Young*, which explained that "aid and abet" encompasses "'assistance rendered by words, acts, encouragement, support, or presence.'"  *Id.* (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 178 (1993)).  And *Hansen* observed that "encourage" and "induce" are among the "most common" verbs historically used to denote

- 23 -

solicitation and facilitation. *Id.* at 771–72. An early American legal dictionary defined "abet" as "To encourage or set another on to commit a crime." 1 J. Bouvier, *Law Dictionary* 30 (1839). Wharton likewise described the common-law meaning of "abet" as "to encourage, advise, or instigate the commission of a crime." 1 J. Ohlin, *Wharton's Criminal Law*, § 10:1, at 298 (16th ed. 2021).

The same understanding remains embedded in modern law. For more than a century, the federal aiding-and-abetting statute has treated one who "induces" the commission of an offense as a principal. Today, it provides that whoever "aids, abets, counsels, commands, induces or procures" the commission of a federal offense "is punishable as a principal." 18 U.S.C. § 2(a); *see Hansen*, 599 U.S. at 772. The Model Penal Code similarly defines solicitation to include "encourag[ing]" another person to engage in specific unlawful conduct when done "with the purpose of promoting or facilitating its commission." Model Penal Code § 5.02(1). The precise requirements of criminal and civil aiding-and-abetting liability are not identical. *See Twitter*, 598 U.S. at 493. But these authorities confirm the proposition stated expressly in § 876(b): purposeful encouragement has long been recognized as a means of furnishing aid to another's wrongdoing.

A standing promise of payment intended to induce an unlawful act fits comfortably within this common-law understanding of aiding and abetting. If, as the complaint alleges, Massalha and Samarah knew that they or their families would receive benefits if they were imprisoned, injured, or killed as a result of qualifying violence, and that assurance influenced their decisions to act, then the promise itself could have encouraged the attacks before they occurred. That payment became due only upon imprisonment, injury, or death does not alter when the alleged encouragement took place.

- 24 -

This alleged affirmative encouragement also distinguishes the case from the passive provision of goods or services addressed in the Supreme Court's aiding-and-abetting cases. Aiding and abetting ordinarily requires an affirmative act undertaken "with the intent of facilitating the offense's commission." *Twitter*, 598 U.S. at 490 (quoting *Rosemond v. United States*, 572 U.S. 65, 71 (2014)). The required conduct must show more than "knowledge, acquiescence, carelessness, indifference, [or] lack of concern"; it must show "interested cooperation, stimulation, [or] instigation." *Ashley*, 144 F.4th at 443 (quoting *Direct Sales Co. v. United States*, 319 U.S. 703, 713 (1943)).

In *Direct Sales*, the defendant sold extraordinary quantities of morphine to a physician it knew was distributing the drug illegally and "actively stimulated" further purchases through discounts and aggressive sales practices. 319 U.S. at 705–07, 712–13. The Court found "informed and interested cooperation, stimulation, instigation" and concluded that the seller had "join[ed] both mind and hand" with the physician. *Id.* at 713. Although *Direct Sales* involved conspiracy, the Supreme Court relied on it to illustrate the affirmative, culpable conduct necessary to support aiding-and-abetting liability. *See Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 291–92 (2025) ("More was needed, we stated, for a provider of generally available goods or services to be liable for a customer's misuse of them—for example, conduct of the kind in *Direct Sales*.").

The distinction is reflected in the Supreme Court's cases involving generally available products and services. In *Twitter*, plaintiffs alleged that ISIS had for years used Facebook, YouTube, and Twitter "as tools for recruiting, fundraising, and spreading their propaganda," that defendants knew of that use, and that their algorithms continued to match ISIS content with users. 598 U.S. at 480–82. Yet the platforms were open to billions of other users, and ISIS received the

same generally available services as everyone else.  The Court emphasized that plaintiffs "never allege[d] that, after defendants established their platforms, they gave ISIS any special treatment or words of encouragement."  *Id.* at 498.  Defendants had at most "stood back and watched" while ISIS misused their services, *id.* at 499, and their relationship with ISIS remained "arm's length, passive, and largely indifferent," *id.* at 500.

*Smith & Wesson* involved a similarly attenuated theory.  Mexico alleged that American gun manufacturers knowingly continued supplying firearms through a three-tier distribution system.  Only a "small minority" of downstream dealers illegally sold guns to traffickers supplying Mexican drug cartels, 605 U.S. at 288–89, but the complaint alleged that the manufacturers knew who the "bad apple dealers" were but continued to supply the distribution chain.  *Id.* at 289.  The Court nevertheless held that the allegations did not plausibly show affirmative assistance: the manufacturers did not directly supply those dealers; the complaint identified no particular criminal transaction they had assisted; and knowledge that some unidentified dealers routinely violated the law amounted to "indifference," not aiding and abetting.  *Id.* at 294–97.  Their alleged failure to police the distribution network was merely "passive nonfeasance."  *Id.* at 297.

And in *Cox Communications, Inc. v. Sony Music Entertainment*, 146 S. Ct. 959 (2026), Cox continued to provide internet service to its subscribers even after receiving 163,148 notices identifying subscriber IP addresses associated with copyright infringement.  *Id.* at 965–66.  Even that degree of notice did not establish inducement.  Cox had not "induce[d]" or "encourage[d]" subscribers to infringe, there was no "evidence of express promotion, marketing, and intent to promote" infringement, and Cox instead supplied ordinary internet access capable of extensive lawful use.  *Id.* at 968–69.  The Court rejected a rule under which merely "supplying a product with knowledge that the recipient will use it to infringe copyrights" sufficed, reiterating that

secondary liability cannot rest on knowledge coupled with inadequate efforts to prevent misuse. *Id.* at 969.

The alleged program here is entirely different.  Plaintiffs allege an explicit, standing *quid pro quo* of money in exchange for the commission of terrorist conduct:  Commit a qualifying terrorist attack, and the promised benefits will follow.  On Plaintiffs' allegations, Defendants did not simply know that third parties might commit violence and fail to prevent them from doing so. They allegedly offered the benefits precisely to encourage the qualifying violence itself.  In other words, the attack was the conduct Defendants sought to bring about – it was not an incidental misuse of some otherwise lawful product or service.  This is affirmative encouragement in the most ordinary sense of the term.  As the Supreme Court explained, "both JASTA and *Halberstam*'s elements and factors rest on the same conceptual core that has animated aiding-and-abetting liability for centuries: that the defendant consciously and culpably 'participate[d]' in a wrongful act so as to help 'make it succeed.'"  *Twitter*, 598 U.S. at 493 (quoting *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949)).

The allegations in this case fit that conceptual core far more closely than the passive provision of generally available goods or services in the cases discussed above.  Plaintiffs allege that Defendants wanted to encourage the qualifying attacks and used the promise of money and other benefits as the means of doing so.  *See Smith & Wesson*, 605 U.S. at 291 (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938) (L. Hand, J.)).  The alleged object of the inducement here was the commission of violent terrorist attacks themselves – the very acts of international terrorism that injured Plaintiffs.  If, as alleged, the standing promise reached Massalha and Samarah and influenced their decisions to attack, Plaintiffs have plausibly alleged

the sort of conscious and culpable participation through affirmative encouragement that *Twitter* identifies as the core of aiding-and-abetting liability.

The timing of the alleged encouragement also distinguishes the authorities cited by Defendants, which concern support first provided only *after* an attack had occurred.  For instance, *Sokolow v. Palestine Liberation Organization*, 60 F. Supp. 3d 509, 517 n.11 (S.D.N.Y. 2014), addressed post-attack "ratification" and explained that "[a] showing of support—even post-attack financial support to the families of terrorists—is not sufficient to demonstrate that Defendants were somehow responsible for the attacks."  *Id.*  Plaintiffs allege pre-attack encouragement – namely a standing promise known to the attackers *before* they acted.

*Shatsky v. Palestine Liberation Organization*, No. 02-CV-2280 (RJL), 2017 WL 2666111 (D.D.C. June 20, 2017), *vacated on other grounds*, 955 F.3d 1016 (D.C. Cir. 2020), likewise concerned evidence of support provided only after a suicide bombing.  At the summary judgment stage, the evidence developed during discovery showed that the PA allocated 600 shekels per month to the family of the suicide bomber "following" the attack.  2017 WL 2666111, at *10.  The court found that evidence "disturbing," but held that "*without more*, these after-the-fact payments" could not permit a reasonable jury to find proximate causation.  *Id.* (emphasis added).  The decision identifies no evidence that the bomber knew beforehand that his family would be paid or that any such promise influenced him.  Accordingly, *Sokolow* and *Shatsky* illustrate why after-the-fact payments, standing alone, cannot establish responsibility for an attack that has already occurred. Neither addressed the theory pleaded here.  Plaintiffs allege that the killers were aware, before they acted, of a standing promise that the families of terrorists would receive ongoing aid if they were killed while carrying out a terrorist attack.  That is an entirely different kettle of fish.

The fact that the program allegedly applied across Palestinian factions, including to members of both Hamas and Fatah, does not weaken the alleged nexus. Eligibility allegedly depended on qualifying conduct, not factional affiliation. A standing offer to reward specified conduct remains directed at that conduct, even when available to anyone who performs it. Plaintiffs allege that Hamas members qualified on the same terms as other Palestinians, and that Massalha and Samarah knew that their Hamas affiliation would not disqualify them. Dkt. No. 30, ¶¶ 67, 107–10, 150, 176. Plaintiffs need not show that Defendants intended to strengthen Hamas as an organization. What matters is that the alleged standing promise extended to Hamas members, including Massalha and Samarah, and allegedly influenced these men before they attacked.

Nor does *Twitter* require Plaintiffs to plead "pervasive, systemic, and culpable assistance" where they plausibly allege that Defendants' assistance reached and encouraged the perpetrators of the particular attacks at issue. *Twitter*, 598 U.S. at 502. In *Twitter*, no allegation connected the defendants' services to the ISIS attack in Istanbul, Turkey. The plaintiffs therefore relied on ISIS's general use of the platforms, a theory that risked imposing liability for "each and every ISIS terrorist act committed anywhere in the world." *Id.* at 501. Here, the allegations are specific to Massalha and Samarah. Each attacker is alleged to have known about the standing promise, each was allegedly influenced by it, and each committed the conduct that triggered the promised benefits. The claim therefore rises or falls on the alleged inducement of these attacks, rather than on an inference drawn solely from generalized assistance to Hamas. As the D.C. Circuit recently explained, where the allegations make meaningful showings of nexus and substantiality, a plaintiff "need not allege that the defendant knew the particulars of each terrorist act it aided and abetted." *Atchley v. AstraZeneca UK Ltd.*, 165 F.4th 592, 608 (D.C. Cir. 2026). The attacker-specific

allegations here supply that nexus without requiring Defendants to have known in advance the particulars of either attack.

The *Halberstam* factors confirm that the alleged assistance is plausibly substantial. These factors are (1) the nature of the act assisted, (2) the amount of assistance provided, (3) Defendants' presence or absence at the time of the tort, (4) Defendants' relationship to the tortious actors, (5) Defendants' state of mind, and (6) the duration of the assistance. *See Halberstam*, 705 F.2d at 483–84, 488. Considered together, they favor Plaintiffs at the pleading stage.

*First,* the nature of the acts assisted weighs heavily in Plaintiffs' favor. The acts allegedly encouraged were deliberate attacks against innocent civilians. *Halberstam* recognized that, for "particularly bad or opprobrious acts," the significance of a given amount of assistance increases with "the blameworthiness of the tortious act or the seriousness of the foreseeable consequences." 705 F.2d at 484 n.13.

*Second,* the amount of assistance alleged was substantial enough to support liability at this stage. The alleged promise included an initial payment to the attacker's family followed by continuing monthly financial support. Dkt. No. 30, ¶¶ 90–98. The complaint alleges that 1,400 shekels – the monthly amount allegedly payable to both families – approximated the average monthly wage in the West Bank. *Id.*, ¶¶ 83–84, 98, 157, 181. The alleged assistance was therefore not trivial and promised meaningful financial support to an attacker's family if the qualifying violence resulted in his death. *See Twitter*, 598 U.S. at 492–93.

*Third,* Defendants' physical absence from the attacks and lack of personal communication with the attackers weigh in Defendants' favor, but only modestly on the facts alleged. *Halberstam* itself imposed liability on a defendant who was absent from the killing because her sustained assistance helped the underlying criminal enterprise succeed. 705 F.2d at 488–89. And *Direct*

*Sales* rejected the significance of the fact that the supplier and physician had never met face-to-face. *See* 319 U.S. at 714. Here, Plaintiffs allege a widely publicized program. On the pleaded facts, the relevant relationship arose from Defendants' public offer of benefits and the attackers' alleged knowledge of that offer.

*Fourth,* Defendants' relationship to the tortious actors also provides some support for Defendants, but is not dispositive on the facts alleged. Plaintiffs do not allege that Defendants personally communicated with Massalha or Samarah or had any individualized relationship with either man. They do allege, however, that Defendants publicly maintained a standing offer of benefits available to persons who committed violence, and Massalha and Samarah allegedly knew of and were influenced by that offer. Thus, although the alleged relationship was impersonal, the complaint plausibly alleges that Defendants' offer reached the two men whose attacks caused Plaintiffs' injuries.

*Fifth,* Defendants' alleged state of mind weighs strongly in favor of substantial assistance. Defendants allegedly tied eligibility to terrorist activity, adjusted benefits according to the consequences of that activity, investigated whether the qualifying conditions had been met, praised attackers and "martyrs," and took steps to preserve the payment system in the face of foreign pressure. Dkt. No. 30, ¶¶ 74–79, 83, 90–98, 111–15, 144. These allegations support an inference that Defendants did not merely tolerate the violent conduct in passive nonfeasance, but deliberately maintained a system meant to encourage it.

*Sixth,* the duration of the alleged assistance weighs strongly in Plaintiffs' favor. The payment program allegedly operated for more than two decades and was in place well before both the 2016 Force attack and the 2025 Gez attack. *Id.*, ¶¶ 65–66, 111–25. Plaintiffs therefore allege a longstanding promise of benefits that Defendants repeatedly maintained and publicized.

- 32 -

Taken together, the six factors plausibly support a finding of substantial assistance. The factors concerning Defendants' physical presence and personal relationship with the attackers weigh somewhat in Defendants' favor, but they are outweighed at this stage by the nature and amount of the alleged assistance, Defendants' alleged state of mind, and the program's duration.

Whether Massalha or Samarah actually knew of Defendants' promise, whether it affected either man's conduct, and whether Defendants made the alleged payments all remain to be proved. If discovery does not produce evidence from which a factfinder could reasonably infer that the promise reached and influenced either attacker, Plaintiffs cannot establish liability. But at the pleading stage, the program's alleged public and longstanding operation, Samarah's prior imprisonment, Defendants' official recognition of each attacker, and the payments allegedly made or authorized to their families lend plausibility to the attacker-specific allegations. Dkt. No. 30, ¶¶ 150, 153–57, 176, 178–81.

Drawing all reasonable inferences in Plaintiffs' favor, the complaint plausibly alleges that Defendants knowingly and substantially assisted each attack by making a standing promise of benefits that reached and encouraged Massalha before the 2016 stabbing and Samarah before the 2025 shooting. Plaintiffs have adequately pleaded the third *Halberstam* element.

## Conclusion

For the foregoing reasons, Defendants' motion to dismiss the complaint is DENIED.

Defendants must answer the complaint on or before September 15, 2026.

The Clerk of Court is respectfully directed to terminate the motion at Docket Number 35.

This constitutes the decision and order of the Court.


Dated: August 10, 2026
      New York, New York


                                     U.S.D.J.